# Illinois Official Reports

## Appellate Court

---

**Longanecker v. East Moline School District No. 37, 2020 IL App (3d) 150890**

---

Appellate Court
Caption

JENNIFER LONGANECKER, Plaintiff-Appellant, v. EAST MOLINE SCHOOL DISTRICT NO. 37 AND ITS BOARD OF EDUCATION, THE ILLINOIS STATE BOARD OF EDUCATION, and ROBERT L. AUGUSTO, in His Official Capacity as Hearing Officer, Defendants-Appellees.

District & No.

Third District
No. 3-15-0890

Filed
Rehearing denied

June 3, 2020
July 16, 2020

Decision Under
Review

Appeal from the Circuit Court of Rock Island County, No. 15-MR-35; the Hon. William S. McNeal, Judge, presiding.

Judgment

Affirmed.

Counsel on
Appeal

Lynn D. Dowd and Francis J. Leyhane III, of Naperville, for appellant.

Lisa Madigan, Attorney General, of Chicago (Nadine J. Wichern, Assistant Attorney General, of counsel), for appellees Illinois State Board of Education and Robert Augusto.

Brian R. Bare, of Whitt Law LLC, of Aurora, and John J. Moroney IV and Randall W. Slade, of Franco & Moroney, LLC, of Chicago, for other appellees.

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Carter concurred in the judgment and opinion.
Justice O'Brien dissented, with opinion.


**OPINION**

¶ 1     Defendant East Moline School District No. 37's Board of Education (Board) dismissed the plaintiff, Jennifer Longanecker, a tenured fifth grade teacher at Glenview Middle School (Glenview), for misconduct that the Board found warranted termination and was not remediable. The Board rejected the recommendations and some of the factual findings previously made by a hearing officer, who found that the charges against Longanecker had not been proven and recommended that she be retained as a teacher.

¶ 2     Longanecker appealed her dismissal by filing a complaint for administrative review in the circuit court of Rock Island County. Longanecker argued that the Board had exceeded its authority under section 24-12 of the School Code (105 ILCS 5/24-12 (West 2014)) by (1) rejecting the hearing officer's factual findings, which were not against the manifest weight of the evidence, and (2) rejecting the hearing officer's recommendation to reinstate Longanecker. The circuit court affirmed the Board's decision. The circuit court found that the Board's decision was the final administrative decision presented for review, that the Board had the statutory authority to modify or reject the hearing officer's findings, and that the Board's factual findings and final decision were not against the manifest weight of the evidence.

¶ 3     This appeal followed.


¶ 4                             FACTS

¶ 5     The following factual summary is taken from the testimony and other evidence presented at the August 2014 hearing before the hearing officer.

¶ 6     Longanecker taught at Glenview from 2003 until her dismissal on March 13, 2014. At the time of her dismissal, Longanecker was tenured.

¶ 7     Beginning on January 29, 2014, Angela Mitchell, a student at Western Illinois University, was assigned to Longanecker's classroom as a "block" teacher. Mitchell spent approximately three hours per day in Longanecker's classroom observing and "practice teaching."

¶ 8     On February 27, 2014, Gaye Dunn, a school counselor at Glenview, delivered Illinois Standards Achievement Test (ISAT) materials to Longanecker's empty classroom at approximately 9:14 a.m. The ISAT is a standardized assessment the federal government uses to hold schools accountable pursuant to the No Child Left Behind Act. The ISAT was scheduled to be administered at Glenview the following week, beginning with "Math Session One" on Monday, March 3, 2014. Video taken by a security camera confirmed Dunn's delivery of the ISAT materials to Longanecker's empty classroom on the morning of February 27, 2014, and showed that no one else entered the classroom until Longanecker returned with her students.

¶ 9     Mitchell testified that, at approximately 10:30 a.m. on February 27, 2014, Longanecker dismissed her students to go to gym class. After the students left, Longanecker and Mitchell

were in the classroom alone. Longanecker closed the door. According to Mitchell, Longanecker then turned to the stack of ISAT test booklets on her desk, picked one up off the top, and said to Mitchell, "[l]et's look at these. We will go through them." Longanecker then opened a seal on the side of the test booklet, tuned to the first page, and began looking at a Reading session of the test booklet. Longanecker commented to Mitchell that "[t[his is the same passage that we used last year. These things don't change." Longanecker turned a few more pages in the test booklet and stated to Mitchell that the students would need to know the "main idea" and the "author's purpose." Longanecker pointed to the word "debris" in the test booklet and said, "we will have to start using that. Throw that 'debris' out. Pick up that 'debris' off the floor and throw it in the trash." Longanecker told Mitchell that "this will work out great because you won't have to be here tomorrow." As Mitchell exited the classroom, Longanecker stated, "oh, yeah, you don't have to stay here while I cheat."

¶ 10    The following day, Mitchell spoke with her student advisor, Kim Moreno, about Longanecker's opening the ISAT test booklet. Moreno then called Dr. Ann Gregory, Western Illinois University's curriculum supervisor. On March 4, 2014, Gregory called Ronald Harris, Glenview's Principal, and told him that she had been approached by "Angela," one of the block students, who had a "moral dilemma" regarding one of her host teachers. Gregory informed Harris that "Angela" had witnessed a Glenview teacher open an ISAT test booklet. Harris believed Gregory was referring to Longanecker because Mitchell was the only Western Illinois University block student he recalled at Glenview. Harris called East Moline School District No. 37 (District) Superintendent Kristin Humphries about the matter. They decided that Harris, Glenview Assistant Principal Jeff Evans, and East Moline Education Association (EMEA) Co-President Laura Kalman would go to Longanecker's classroom and examine her ISAT test booklets.

¶ 11    Each ISAT test booklet had a unique serial number. When Harris, Evans, and Kalman arrived at Longanecker's classroom on March 4, 2014, Harris checked the serial numbers of each ISAT test booklet in Longanecker's classroom against a partial list of ISAT test booklets provided by Dunn. Harris also checked whether the seals on the Reading test sessions of each ISAT test booklet were intact. Because the Reading test sessions of the ISAT were not scheduled to begin until March 6, 2014, the Reading test session seals on all ISAT test booklets should have been intact when Harris checked them. Harris eventually came upon an ISAT test booklet that had broken seals on all three reading sessions. This test booklet belonged to a student identified in the record as "Student A."

¶ 12    The witnesses' testimony differed as to how Student A's booklet was discovered. According to a memorandum prepared by Evans on March 4, 2014, Longanecker found the test booklet with the broken seal under a stack of newspapers on her desk and brought the booklet to Harris. However, Longanecker testified that Harris found the test booklet in question in the pile of booklets he was examining. Longanecker admitted that she brought an ISAT document to Harris from her desk, but she claimed that she brought Harris an ISAT Coordination Manual, not Student A's test booklet. Kalman testified that Harris found the test booklet with the improperly broken seals "about halfway through" the pile of booklets he was examining, although she conceded that she was not sure where the booklet was discovered.[1]

---

[1]Kalman testified that Harris did not tamper with the seals on Student A's test booklet and that the booklet had not come from another classroom.

According to a memorandum prepared by Harris on March 5, 2014, Evans found a test booklet on Longanecker's desk that was kept separately from the rest of the test booklets. Harris stated that Evans picked up that test booklet and added it to the pile of booklets that Harris was examining. According to Harris's account, when Harris came upon Student A's test booklet with the broken seals, Evans believed that this booklet was the one he had discovered on Longanecker's desk.

¶ 13 Longanecker testified that, during the search of her classroom, she though that she was being accused of "stealing" ISAT test booklets. However, she admitted saying to Harris, "I don't care about your ISAT tests enough to cheat." In his March 5, 2014, memorandum, Harris stated that, when he asked Longanecker if she could explain why the seals on Student A's booklet were broken, she responded, "I don't know. Why don't you ask him?" Thereafter, Evans brought Longanecker and Kalman to a conference room in the school's front officer where he informed Longanecker that she was going to be placed on administrative leave pending an investigation and that she needed to go home.

¶ 14 Immediately after discovered Student A's test booklet in Longanecker's classroom on March 4, 2014, Harris interviewed Student A in an empty classroom across the hall from Longanecker's classroom. No one else was present during the interview. Harris testified that he told Student A that he was not in trouble and that it was important to be honest. Student A told Harris that he did not break the seals on the Reading session of his ISAT test booklet. He said that he had only broken the seals to the test sessions that had already been conducted (*i.e.*, the Math test sessions) and that he knew not the break the seals of other test sessions. In his March 5, 2014, memorandum, Harris noted that Student A was "very adamant about knowing the rules of ISAT testing and said that he had ONLY opened the seals of to the 2 math testing session and only when the directions were given to do so."[2] Harris believed that Student A was telling the truth and found him to be "very sincere." Harris based this belief on his professional experience with children, on Student A's record (which did not include deceitful behavior), and on the fact that Student A had no reason to lie.

¶ 15 When Student A testified at the hearing approximately five months later, he initially stated that all of the seals on his ISAT test booklet were closed when he first received the booklet on March 3, 2014, and that he opened two seals that morning. However, he later testified that he did not remember what he opened. Although Student A initially stated that he told Harris that he had accidentally opened the seals to the ISAT test booklet, he later testified that he did not remember what he told Harris. When he was subsequently asked three more times what he had told Harris, Student A gave no response. Student A also testified that his classmates told him that he might have caused Longanecker to lose her job because "they [saw] my book open on her desk."

¶ 16 On March 6, 2014, the District held a meeting concerning Student A's ISAT test booklet. Longanecker, Humphries, and Harris, attended the meeting. Chris Mueller, the District's director of human resources, and Joseph Conrad, the Illinois Education Association UniServe director, were also present. Humphries gave Longanecker a copy of a letter outlining his recommendation to the Board that Longanecker be dismissed and read the letter to Longanecker. Humphries's recommendation was based solely upon Longanecker's alleged

---

[2]Harris apparently did not ask Student A whether all of the seals on the ISAT test booklet were intact when Student A first received it.

misconduct involving Student A's ISAT test booklet. Humphries advised Longanecker that he would present his recommendation to the Board on March 13, 2014.

¶ 17    The following day, Evans and Dunn reviewed a surveillance video that confirmed that Dunn had delivered ISAT test booklets to Longanecker's classroom on February 27, 2014, at 9:14 a.m. The "ISAT School Test Booklet Security Checklist" that Dunn used to distribute ISAT test booklets to teachers indicated that Dunn delivered booklets with security numbers 458790877 through 458790885 to Longanecker's classroom. Student A's booklet, which was discovered in Longanecker's classroom on March 4, 2014, bore security number 4587910063, which was not listed on the security checklist as one of the booklets delivered to Longanecker.

¶ 18    On March 11, 2014, Humphries and Harris met with Mitchell. During that meeting, Mitchell described the February 27, 2014, incident during which Longanecker had allegedly opened an ISAT test booklet. She also told Humphries and Harris that Longanecker had improperly guided students to the correct answers during "MAP" (Measures of Academic Progress) assessment sessions and had instructed Mitchell to do the same. The MAP assessment is a computer based assessment given to students three times per year in a computer lab. It is used to monitor student growth, identify areas of need, and make adjustments to student education if necessary. The MAP proctor handbook expressly prohibits a test proctor from defining words or providing any hints or clarifications to students taking the assessment. Mitchell told Humphries and Harris, and later testified, that Longanecker violated this prohibition during the mid-year MAP testing session. Mitchell testified that, while the students were taking the mid-year MAP assessment, some students asked questions like, "is the answer A or B?" According to Mitchell, Longanecker would sometimes respond to these questions by "pick[ing] out two that [the students] should have chosen from" (for example, Longanecker would respond, "no, it's B or C"). Mitchell further claimed that, when Mitchell was left alone with the students during the second day of MAP testing, Longanecker told Mitchell that she could answer student questions, narrow down answers for students the way Longanecker had, or define a word for students. The March 11, 2014, meeting with Mitchell was the first time the District became aware of any improprieties regarding the MAP assessments. After Harris discussed the matter with Mitchell on March 11, 2014, he drafted a memorandum summarizing Mitchell's allegations regarding Longanecker's improper administration of the MAP testing. Mitchell's testimony on this subject before the hearing officer was consistent with Harris's memorandum.

¶ 19    LaVonne Peterson, the associate superintendent for curriculum and instruction, investigated Mitchell's allegations regarding the MAP assessments. Peterson concluded that an examination of "RIT scores" (a disaggregation of Longanecker's students' scores on the MAP test) revealed several examples of growth that would not be typical. While only 50% of students nationwide are expected to meet their growth target, 77.5% of Longanecker's students made it halfway to their year-end growth goal by the time of the winter MAP test. Only 62% of other teachers' students reached that growth level at the time of the winter test. Moreover, 61% of Longanecker's students had already reached their year-end growth goal by the time of the winter MAP test, whereas only 42% of other teachers' students had done so. Peterson characterized these results as an "outlier" that corroborated Mitchell's allegations about how Longanecker conducted the MAP tests. Peterson found it "crazy" that Longanecker's class had an average growth of 10 RITs, as compared to 4 RITs and 6 RITs for two other teacher's classes. Peterson testified that, when looking at the group as a whole, the high scores for

Longanecker's students were a "red flag" that provided "strong evidence" of misconduct, particularly when combined with Mitchell's eyewitness testimony. Peterson testified that she believed Mitchell's account.

¶ 20    When asked during the hearing whether any of the individual score reports for Longanecker's students gave him reason to believe that Longanecker or anyone else had provided inappropriate assistance to the students during MAP testing, Harris responded, "[n]o." He also agreed that there was no evidence other than Mitchell's allegations that Longanecker provided such inappropriate assistance to her students. However, on redirect examination, Harris testified that, when analyzing MAP data, he looked at how the class was doing overall and grade level ability as opposed to individual student scores.

¶ 21    One of Longanecker's students, who is identified in the record as "Student B," also testified at the hearing. Student B was an 11-year-old, fifth grade student who received a 30-point jump in his Language Arts MAP score between the Fall 2013 and Winter 2014 testing sessions. Student B testified that he did not remember asking Longanecker any questions about the MAP test while he was taking it. He stated that he did not need to ask questions because he knew how to take the test. Student B testified that Mitchell was present when he took the February 2014 MAP test. According to Student B, neither Mitchell nor anyone else gave him any help with the answers.

¶ 22    During her March 11, 2014, meeting with Humphries and Harris, Mitchell also raised concerns regarding Longanecker's handling of the "Language!" program. "Language!" is remedial reading program that replaces core instruction for students who need additional support. Mitchell stated that Longanecker had the students take the Language! program assessments "as a whole" and fill in the bubbles in their test books together until the last few questions, which each student would answer on his or her own. According to Mitchell, Longanecker rarely taught from the Language! book, and she told the students to take their Language! books out and open them on their desks "[i]n case anyone was to walk in" the classroom. Mitchell claimed that Longanecker performed "practice runs" where she would knock on the classroom door, pretending to be administration, and the students would open their Language! books. Mitchell also stated that, during Language! testing sessions, Longanecker would sometimes go over questions on the board after the test and would have the students change their answers the correct answers to make it look as if the students had answered the questions correctly. Although portions of the Language! assessments are designed to be read aloud by the teacher, with the exception of certain "example" questions, the Language! assessments are not designed to be answered cooperatively or with the assistance of the teacher.

¶ 23    Longanecker testified that students would not be able to take the Language! tests on their own. However, she denied giving the students any inappropriate assistance during the Language! assessments. Longanecker stated that helping children with any type of assessment would harm the children.

¶ 24    Evans testified that, when he visited Longanecker's classroom during Language! sessions, he observed the students singing, clapping, and performing other activities, all of which were part of the Language! program. Peterson stated that, when she visited Longanecker's class during Language! sessions, it was always energetic and the kids were excited and looking forward to the lesson. However, Peterson noted that she had received complaints from other

teachers and from the District's Language! consultant that Longanecker had lagged in her administration of the Language! program.

¶ 25     The District charged Longanecker with (1) opening the Reading section of an ISAT test booklet several days before the Reading test was scheduled, with the intention of basing her instruction of students on the questions to be administered in the ISAT; (2) helping students take the 2013-14 MAP tests in a manner that would guide them to the correct response and instructing Mitchell to guide students to the correct answers during testing; and (3) allowing or directing students to work on the Language! assessments and fill in answers together as a whole, with the exception of the last few questions on the assessment. The District found that this misconduct warranted dismissal and was not remediable. It adopted a resolution authorizing charges and dismissal and subsequently adopted a notice of charges and dismissal, which it sent to Longanecker. Longanecker timely requested a hearing before a hearing officer, which was conducted in August 2014.

¶ 26     The hearing officer concluded that the District had failed to meet its burden of proving by a preponderance of the evidence that the charged misconduct occurred. The hearing officer found "no corroborating testimony or exhibits *** to substantiate Mitchell's testimony that Longanecker intended to base her instruction of students on the questions to be administered in the [ISAT] standardized test." Moreover, although the hearing officer did not expressly find that Mitchell's testimony lacked credibility, he noted that while Mitchell was able to provide a very detailed account of Longanecker's alleged tampering with the ISAT test booklets on February 27, 2014, she was unable to remember several other events that occurred on that day. The hearing officer further noted that, although Mitchell began working with Longanecker on January 29, 2014, she did not report any misconduct by Longanecker with respect to the MAP and Language! tests until she met with Harris and Humphries on March 11, 2014. Having found that the District had failed to prove the charged misconduct, the hearing officer also found that the District had failed to show that Longanecker had engaged in irremediable conduct warranting her dismissal. Accordingly, the hearing officer ordered the District to reinstate Longanecker to her teaching position and reimburse her for lost wages and benefits and for the costs of the action, including her attorney's fees.

¶ 27     On December 15, 2014, the Board adopted a resolution reversing the hearing officer's ultimate conclusion and finding that every charge of misconduct brought against Longanecker had been proven. The Board noted that it had considered the hearing officer's findings of fact and had "incorporate[d] those findings of fact herein." However, based upon its independent consideration of the witness testimony and other evidence presented during the hearing, the Board found that the hearing officer's factual findings were against the manifest weight of the evidence, and it modified the hearing officer's findings in several material respects. First, the Board found that Mitchell's testimony was "credible" and that "any implication otherwise is not supported by the evidence." The Board concluded that Mitchell's inability to recall "minor events that took place nearly six months prior [to the dismissal hearing]" "[did] not detract from her detailed and credible testimony about the misconduct she witnessed [Longanecker] commit that same day."

¶ 28     Further, the Board found that Longanecker was not a credible or truthful witness. In support of this finding, the Board noted that (1) Longanecker's testimony concerning the events of February 27, 2014, contained many inconsistencies; (2) Longanecker testified that 95% of her students had ADD or ADHD but later admitted that this was a "guess" that was not

substantiated by any medical records or individualized educational plans; (3) On January 29, 2014, Longanecker sent an e-mail claiming that she had finished books A and B of the Language! program but later admitted that it would have been impossible to finish books A and B by that date (She further admitted that she corrected her initial misstatement only after two staff members e-mailed her about the claim.); and (4) Longanecker admitted that she lied in two separate e-mails wherein she stated that she respected Harris.

¶ 29        The Board further found that Student A's hearing testimony "contained numerous inconsistencies and cannot be considered as reliable evidence." However, the Board found Harris's testimony regarding his interview with Student A—and Harris's account of Student A's statements in his March 4, 2014, memorandum—to be credible.

¶ 30        In addition, the Board found that the evidence did not show that any school administrator harbored any animus toward Longanecker.[3] The Board noted that Humphries had issued a letter of commendation to Longanecker in October 2013 and testified that he did not consider Longanecker to be a "problem employee." The Board further observed that, although Harris sent Longanecker a letter of reprimand on February 3, 2014, he testified that he felt he and Longanecker had a good relationship and that there was a good atmosphere between them even after the reprimand.

¶ 31        The Board also found that Longanecker's misconduct was irremediable and warranted her dismissal. The Board concluded that Longanecker's misconduct harmed students and damaged student-teacher relationships. It noted that helping students answer questions on the MAP and Language! assessments defeated the purpose of those assessments. The Board noted that Longanecker's actions were particularly harmful to Student A (whom Longanecker had implicated), particularly considering Student A's testimony that other students had told him that he had caused Longanecker to lose her job. The Board observed that, as a veteran teacher, Longanecker was expected to set a good example for other teachers and for student teachers like Mitchell. The Board found that, contrary to that expectation, Longanecker had acted in a manner that was "unconscionable" and that "broke one of our foundational principles in education." Further, the Board concluded that Longanecker's misconduct had damaged the reputation of both the school and the District.

¶ 32        The Board found Longanecker's conduct to be irremediable because no prior warning could have prevented or corrected her misconduct. It noted that the "ISAT Test Administration Manual" and the ISAT test booklets each contained numerous warnings against opening ISAT test booklets prior to the administration of the test. Moreover, Longanecker admitted that she knew that opening an ISAT test booklet before the administration of the ISAT was prohibited.

¶ 33        Longanecker appealed the Board's decision to the circuit court of Rock Island County, which affirmed the Board's decision. The circuit court noted that, pursuant to section 24-12(d)(9) of the School Code, it "[gave] consideration to the hearing officer's Findings of Fact and recommendation, as well as the School Board's decision and Findings of Fact." 105 ILCS 5/24-12(d)(9) (West 2014). However, the court concluded that the 2011 amendments to section 24-12 of the School Code granted the Board the discretion to overrule the hearing officer's

---

[3]Although the hearing officer did not explicitly find that any administrator had animosity toward Longanecker, he set forth several of his findings of fact under the heading "School District Administrators' Animus Toward Longanecker." The Board modified the hearing officer's implicit finding on this issue.

decision and required the court to affirm the Board's decision unless it found that the Board's decision was against the manifest weight of the evidence. The court found that the Board's decision was not against the manifest weight of the evidence and affirmed the Board's decision.

¶ 34                                               ANALYSIS

¶ 35        As an initial matter, we note that Longanecker's brief on appeal does not comply with the requirements of Illinois Supreme Court Rule 342(a) (eff. Jan. 1, 2005). That rule provides, in relevant part, that

> "[t]he appellant's brief shall include, as an appendix, *** a copy of the judgment appealed from, [and] any opinion, memorandum, or findings of fact filed or entered by the trial judge *or by any administrative agency or its officers*." (Emphasis added.) Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005).

Although Longanecker included a copy of the circuit court's order in her appendix, she failed to include a copy of the Board's decision, in violation of Rule 342(a). Moreover, the table of contents to the record on appeal included in Longanecker's appendix does not state the nature of each document, the names of all witnesses, and the pages on which their testimony begins, as required by Rule 342(a).

¶ 36        When a brief or appendix fails to follow the requirements set forth in Rule 342(a), we may dismiss the appeal. *Perez v. Chicago Park District*, 2016 IL App (1st) 153101, ¶ 8. Our supreme court's rules are not advisory suggestions but mandatory rules that must be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. Because the parties included citations to the relevant record materials in their briefs on appeal, Longanecker's violation of Rule 342(a) has not precluded meaningful review of the Board's decision in this case. Accordingly, although we have the discretion to dismiss this appeal, we elect to address the issues Longanecker raises on their merit. However, we admonish Longanecker's counsel, and all appellants, to ensure that their briefs on appeal are in full compliance with Rule 342(a).

¶ 37        We now turn to the merits of the Longanecker's appeal. Longanecker argues that the Board violated section 24-12 of the School Code by failing to incorporate all of the hearing officer's findings of fact and by summarily rejecting the hearing officer's factual findings and its recommendation that Longanecker be reinstated. Longanecker acknowledges that section 24-12 (as amended in 2011) makes the Board the final decision maker in teacher dismissal cases. However, she contends that the statute "sharply limit[s] a school board's authority to review a *** hearing officer's findings and conclusions, in a manner similar to what a court may do in administrative review." Specifically, Longanecker argues that amended section 24-12(d)(8) authorizes the Board to "modify or supplement" the hearing officer's findings of fact *only* if the hearing officer's findings are against the manifest weight of the evidence, *i.e.*, only where an opposite conclusion is clearly apparent. 105 ILCS 5/24-12(d)(8) (West 2014). Moreover, she notes that amended section 24-12(d)(9) provides that, when the Board dismisses a teacher for cause against the hearing officer's recommendation (as here), the reviewing court "shall give consideration" both to the Board's decision and supplemental findings of fact (if any), "*and the hearing officer's findings of fact and recommendation*." (Emphasis added.) 105 ILCS 5/24-12(d)(9) (West 2014). Longanecker argues that the Board violated these statutory requirements and applied an improper standard of review by (1) "fail[ing] to give the arbitrator's findings and conclusion the deference to which they are entitled under a manifest weight of the evidence standard," (2) "blatantly reweigh[ing] the evidence," (3) "[making] its

- 9 -

own self-serving credibility determinations," and (4) "substitut[ing] its preordained conclusion that *** Longanecker must be terminated for the independent judgement of the professionally trained [Illinois State Board of Education (ISBE)] hearing officer." In essence, Longanecker maintains that the Board lacked the statutory authority to reject the hearing officer's findings and recommendation because they were not against the manifest weight of the evidence.

¶ 38        Longanecker's arguments are foreclosed by our supreme court's decision in *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, which was issued after the parties' presented oral arguments in this appeal. In *Beggs*, as in this case, a board of education terminated a teacher against the recommendation of the hearing officer. Our supreme court confirmed that it is the school board's decision, and not the hearing officer's findings and recommendation, that is the final decision for purposes of administrative review and that is entitled to deference by reviewing courts. *Id.* ¶ 57.

¶ 39        In so ruling, our supreme court rejected our appellate court's prior conclusion that the hearing officer's findings and recommendation were entitled to a "certain level of deference" in teacher dismissal cases. *Id.* ¶¶ 59-62. Echoing Longanecker's arguments in this case, our appellate court had held that the hearing officer's findings must be accorded deference because the hearing officer is "the impartial entity charged with hearing evidence and evaluating witness credibility" and because amended section 24-12 of the School Code (1) requires the school board to incorporate the hearing officer's factual findings, (2) prohibits the school board from departing from the hearing officer's findings unless they are against the manifest weight of the evidence, (3) requires hearing officers to have certain qualifications, (4) requires a reviewing court to "give consideration" to both the school board's decision and the hearing officer's findings of fact and recommendation when conducting its review. *Id.* ¶ 58. Our supreme court disagreed, ruling that the school board's decision is entitled to the normal deference accorded to a final agency decision maker under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)). *Beggs*, 2016 IL 120236, ¶¶ 45, 56-57. Although our supreme court acknowledged that section 24-12(d)(8) of the School Code requires the Board to incorporate the hearing officer's factual findings, it noted that the same section allowed the Board to supplement or modify the hearing officer's findings "if, in the Board's *opinion*, it believes they are against the manifest weight of the evidence." (Emphasis in original.) *Id.* ¶ 59. The supreme court observed that the appellate court had "largely ignored the 'in its opinion' language of the statute, which clearly indicates the legislature's intent to vest the Board with discretion to depart from the hearing officer's findings." *Id.* Although the supreme court acknowledged that the statute sets forth a manifest weight of the evidence standard to "steer" the Board's review of the hearing officer's findings, the court concluded that "[t]his does not equate *** with a requirement that a reviewing court give deference to the hearing officer's findings" because "the statute plainly vests the Board with final decision-making authority after the hearing officer's 'recommendation' is reported to the Board."

¶ 40        Moreover, although the supreme court acknowledged that section 24-12(d)(9) of the School Code also directs the reviewing court to "give consideration to" the hearing officer's findings of fact and recommendation (together with the Board's supplemental factual findings and final decision), it ruled that "this provision *** simply reinforces the existing statutory and case law requirement that the court on administrative review should consider the entire record." *Id.* ¶ 61. The supreme court noted that, just as the agency is required to "consider" the findings of its hearing officer, "[a] court on review is also expected to consider the entire record,

including consideration of the hearing officer's findings of fact that involve credibility determinations." *Id.* Nevertheless, the supreme court made it clear that (1) "on administrative review the court still only reviews the agency's findings of fact under the manifest weight of the evidence standard, not the hearing officer's recommendation and factual findings," and (2) "[t]his is the case even when the findings of fact depend on the credibility of the witnesses—and even if the hearing officer, rather than the board, observed those witnesses." *Id.*; see also *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 96-99 (1992); *Acorn Corrugated Box Co. v. Illinois Human Rights Comm'n*, 181 Ill. App. 3d 122, 136-40 (1989); *Caracci v. Edgar*, 160 Ill. App. 3d 892, 895-96 (1987). The same result obtains even where, as in *Beggs* (and as in this case), the statute governing the agency directs the agency to "adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence." (Internal quotation marks omitted.) *Beggs*, 2016 IL 120236, ¶ 61; see also *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 136.

¶ 41 Our supreme court also rejected our appellate court's assertion (which Longanecker repeats here) that the Board "is a partisan entity" while "the hearing officer alone is the impartial and disinterested entity." *Beggs*, 2016 IL 120236, ¶ 62. Our supreme court found this assertion to be "both incorrect and an improper basis for departing from the traditional standard of review of agency decisions." *Id.* The court noted that it was "well settled that an administrative hearing 'is not a partisan hearing with the agency on one side arrayed against an individual on the other' " (*id.* (quoting *Abrahamson*, 153 Ill. 2d at 94)); "[r]ather, it is an administrative investigation instituted for the purpose of ascertaining and making factual findings" (*id.*). Our supreme court further noted that "board members comprising the agency decision maker are assumed to be people of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." (Internal quotation marks omitted.) *Id.*

¶ 42 Accordingly, contrary to Longanecker's suggestion, we review the Board's decision only (not the hearing officer's findings and recommendation), and we accord no deference to the hearing officer's factual findings and recommendation, except for those findings that are incorporated and not rejected or modified by the Board.[4] Our review of the Board's decision is a two-step process. First, we review the Board's factual findings (including the factual findings of the hearing officer that were incorporated unmodified into the Board's decision as well as the Board's supplemental findings) to determine whether those findings were against the manifest weight of the evidence. *Id.* ¶ 63. Factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.* ¶ 50. Second, we must

___

[4]Justice O'Brien's dissent is premised on the assumptions that the hearing officer's findings are entitled to deference, that the Board may not depart from the hearing officer's findings unless such findings are against the manifest weight of the evidence, and that a reviewing court should reverse any attempt by the Board to modify or supplement the hearing officer's findings if, in the court's opinion, the hearing officer's findings were not against the manifest weight of the evidence. See, *e.g.*, *infra* ¶¶ 64-65, 74, 76. As discussed above, our supreme court explicitly rejected each of these propositions in *Beggs*. *Supra* ¶¶ 38-40, 42 (quoting and discussing *Beggs*, 2016 IL 120236, ¶¶ 57, 59-62). We review only the *Board's* ultimate findings under the deferential manifest-weight-of-the-evidence standard, not the hearing officer's findings or recommendation. *Beggs*, 2016 IL 120236, ¶ 61. That remains the case even when, as here, the Board's findings of fact depend on the credibility of the witnesses and even if the hearing officer, rather than the board, observed those witnesses. *Id.*

determine whether those findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist. *Id.*; see also *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 551 (1981). A school board's determination of cause to discharge is subject to reversal where it is "arbitrary, unreasonable, or unrelated to the requirements of service." *Beggs*, 2016 IL 120236, ¶ 63. This is a mixed question of law and fact which we review under the clearly erroneous standard of review. *Id.* We will uphold the Board's discharge decision unless, after applying the governing legal standard for discharge to the established facts, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.*

¶ 43        The Board's finding that Longanecker committed the misconduct charged in this case was not against the manifest weight of the evidence. Regarding Longanecker's alleged misconduct in administering the ISAT, Mitchell testified that she saw Longanecker open the Reading test seals on an ISAT test booklet on February 27, 2014, prior to the administration of the ISAT Reading test. Mitchell further testified that Longanecker made comments to her indicating that she intended to use the ISAT booklet to "cheat" and that she would base her instruction on the questions contained in the ISAT booklet. The Board found Mitchell's "detailed" testimony on this subject to be credible. The District's investigation corroborated Mitchell's testimony in certain key respects. It is undisputed that, on March 4, 2014 (two days prior to the administration of the ISAT Reading test), an ISAT test booklet with the seals to the Reading test sessions broken was found in Mitchell's classroom. Later that day, Student A, one of Longanecker's students, acknowledged that this test booklet at issue was his. Harris testified that, when he interviewed Student A that day, Student A told Harris that he did not break the seals on the Reading session of his ISAT test booklet.

¶ 44        Longanecker suggests that Mitchell's account of Longanecker's alleged misconduct regarding the ISAT booklet was not credible because Mitchell's recollection of other events transpiring on February 27, 2014, was "hazy" and was contradicted by other evidence. Aside from Longanecker's alleged misconduct regarding the ISAT test booklet, Mitchell could remember little else that occurred on that day with any clarity. She thought that she gave a poetry pretest to students that day but could not recall exactly when she did so. She could not recall Dunn delivering the ISAT test booklets to Longanecker's classroom. Although she vaguely remembered attending an assembly with the students at some point, she could not recall whether that assembly took place on February 27, 2014. During her testimony, Mitchell stated that she could not say what happened during the lesson on February 27, 2014 or "that day's activities with the students" because "it was a stressful day." Longanecker and Evans confirmed that there was a River Bandits assembly on February 27, 2014. Moreover, Longanecker testified that Mitchell would not have given the students a poetry pretest on February 27 because the poetry unit did not begin until March 3. Longanecker's testimony on this point is supported by the record, because Mitchel did not e-mail her first poetry lesson plan to Longanecker until February 28.

¶ 45        The Board concluded that Mitchell's inability to recall "minor events that took place nearly six months prior [to the dismissal hearing]" "[did] not detract from her detailed and credible testimony about the misconduct she witnessed [Longanecker] commit that same day." We cannot say that this credibility finding was against the manifest weight of the evidence. Minor discrepancies in a witness's testimony are not unusual (*In re Jonathan C.B.*, 2011 IL 107750, ¶ 237) and do not destroy the witness's credibility (*People v. Mays*, 81 Ill. App. 3d 1090, 1099

(1980)). Seeing her supervising teacher open an ISAT test booklet and declare her intention to cheat on the ISAT test would be a shocking and stressful event for Mitchell or for any student teacher. It is not surprising that Mitchell would have a clear memory of those events but only a "hazy" memory of other, more mundane events that occurred on the same day when she testified approximately five months later.[5]

¶ 46    Longanecker argues that the Board failed to prove that Student A's ISAT test booklet (which was the only test booklet found with prematurely opened seals) was delivered to Longanecker's classroom on February 27, 2014. Although Dunn testified that she "assumed" that the test booklet at issue was assigned to Longanecker, she admitted that she "did not know that." A printed list of ISAT test booklets delivered to Longanecker's classroom identified by serial number did not include the serial number of Student A's test booklet (although someone wrote that serial number on the list by hand). Contrary to Longanecker' argument, these facts do not render the Board's misconduct finding against the manifest weight of the evidence. Student A acknowledged that the test booklet at issue was his, and he was one of Longanecker's students. Moreover, during his initial interview with Harris, Student A testified that he did not open the Reading test seals on his test booklet when he took the ISAT Math test on March 3, 2014. Further, it is undisputed that the test booklet at issue was found in Longanecker's classroom on March 4, 2014, two days before the students took the Reading test, with the Reading test seals opened. These facts, coupled with Mitchell's testimony, supported a reasonable inference that Longanecker had possession of Student A's test booklet and prematurely opened the Reading test seals on that booklet with the intent to cheat on the test. Given the ample evidence supporting that inference, the dissent's discussion of flaws in Glenview's testing procedures and the purported lack of proof that Dunn delivered test booklet No. 4587910063 to Longanecker's classroom (see *infra* ¶¶ 74-77) does not render the Board's finding on this issue against the manifest weight of the evidence.

¶ 47    Longanecker contends that the Board unfairly "cherry-picked" Student A's testimony, finding his March 4, 2014, statement to Harris credible but finding his subsequent hearing testimony to be inconsistent, unreliable, and unworthy of credence. During his hearing testimony, Student A testified that, when he first received his ISAT test booklet during the first day of testing on March 3, 2014, all of the seals on the booklet were closed. This suggests that Longanecker did not prematurely open the Reading test seals on Student A's test booklet on February 27, 2014, as Mitchell alleged. Longanecker contends that the Board's decision to credit Student A's initial denial that he had opened the Reading test seals but reject his subsequent testimony that all of the seals were intact on March 3, 2014, is "very convenient"

<hr>

[5]The dissent misconstrues the Board's finding (and our judgment) on this issue as suggesting that stressful events would *diminish* Mitchell's memory of the relevant events. *Infra* ¶ 66 (stating that "[t]he majority, like the Board, speculates that Mitchell's lack of detail regarding" her allegations of misconduct against Longanecker "was to be expected based on the stress of the situation"). The dissent then notes that "[w]hile Mitchell did testify it was a very stressful period, there was no testimony that stress induces memory loss or allows a person to remember only certain events occurring in the same time period." *Infra* ¶ 68. Contrary to the dissent's argument, however, the Board's point (and our point) was not that stress causes memory loss but rather that stressful and exceptional events (like hearing one's boss admit to cheating) are normally recalled in greater detail than are more mundane, everyday events, such as a particular pretest or assembly took place. It was the latter type of events that Mitchell had difficulty recalling, not the former, which stands to reason.

- 13 -

and demonstrates the Board's bias and animus against Longanecker. According to Longanecker, the Board (1) credited only testimony that supported its preferred conclusion and improperly disregarded any contrary testimony and (2) summarily rejected any findings by the hearing officer that undermined the case against Longanecker instead of being "steered" by the manifest weight of the evidence standard when considering the hearing officer's findings, as required by section 24-12 and *Beggs*.

¶ 48    We do not find these arguments to be persuasive. The Board's decision to credit Student A's initial statement to Harris but not his subsequent hearing testimony was not against the manifest weight of the evidence. Student A made his initial statement on the day after the incident in question, while his recollection of the event was presumably fresh and accurate. He did not testify at the hearing until several months later. Moreover, Student A's hearing testimony was rife with inconsistencies. Student A initially testified that all of the seals on his ISAT test booklet were closed when he first received the booklet on March 3, 2014, and that he opened only two seals that morning. However, he later testified that he did not remember what he opened. In addition, although Student A initially testified that he told Harris that he had accidentally opened the seals to the ISAT test booklet, he later testified that he did not remember what he told Harris. When Student A was later asked three more times what he had told Harris, he gave no response. Moreover, Student A testified that his classmates told him that he might have caused Longanecker to lose her job because "they [saw] my book open on her desk." This suggested a potential motive for Student A to testify falsely in an attempt to protect Longanecker. For all these reasons, the Board's findings that Student A's initial statement to Harris was reliable and that his hearing testimony was unreliable were not against the manifest weight of the evidence.[6]

¶ 49    There was also sufficient evidence to support the Board's finding that Longanecker had committed misconduct by improperly assisting students during MAP testing. Mitchell testified that, during the MAP testing, she observed students ask Longanecker questions like "is the answer A or B?" and Longanecker would respond "no its B or C" or "kind of pick out two that they should have chosen from." Before Mitchell supervised the students by herself on the second day of MAP testing, Longanecker told Mitchell that she (Mitchell) could answer student questions and define words for them. The MAP proctor handbook explicitly prohibits a proctor from defining words for students or giving them hints or clarifications. Mitchell's claim that Longanecker improperly assisted students on the MAP testing was corroborated by the unusually and disproportionately high aggregate MAP scores of Longanecker's students, which Peterson characterized as "crazy" and a "red flag" that strongly supported Mitchell's testimony. Although the dissent cites evidence that arguably undermines Peterson's conclusion (see *infra* ¶¶ 70-71), it was not against the manifest weight of the evidence for the Board to credit Peterson's opinion that the anomalous MAP scores supported Mitchell's allegations that Longanecker had improperly coached her students. In any event, the Board could have

---

[6]Contrary to the dissent's suggestion, we have not relied on any testimony by Student A that his test booklet "had broken seals" when he took the Math test on March 3. Rather, we have merely found that the Board did not err in relying on Student A's initial statement to Harris that he had opened only the math session seal, not the reading session seals, and that it was not against the manifest weight of the evidence for the Board to credit that testimony over the self-contradictory, equivocal, and possibly biased testimony that Student A gave several months later at the hearing.

reasonably found that Longanecker had improperly assisted her students with respect to MAP testing based on Mitchell's testimony alone, which the Board properly found to be credible.[7]

¶ 50    As Longanecker notes, Student B testified that he did not recall asking any questions or receiving any help during MAP testing. However, even assuming that Student B received no such assistance, that does not preclude the possibility that Longanecker improperly assisted other students during MAP testing.

¶ 51    After considering all of the evidence presented, including Mitchell's testimony, the aberrant aggregated MAP test scores of Longanecker's students, and Peterson's and Harris's testimony about those scores, the Board could have reasonably found that the charges of misconduct relating to Longanecker's administration of MAP testing were proven by a preponderance of the evidence. An opposite conclusion is not clearly apparent. Thus, the Board's finding was not against the manifest weight of the evidence.

¶ 52    The evidence also supports the Board's finding that Longanecker committed misconduct by improperly assisting students during Language! testing. Mitchell testified that Longanecker had the students take the Language! program assessments "as a whole" and fill in the bubbles in their test books together until the last few questions, which each student would answer on his or her own. Mitchell further stated that, during Language! testing sessions, Longanecker would sometimes go over questions on the board after the test and would have the students change their answers to the correct answers to make it look as if the students had answered the questions correctly. According to Mitchell, Longanecker rarely taught from the Language! book, and she told the students to take their Language! books out and open them on their desks "[i]n case anyone was to walk in" the classroom. Mitchell claimed that Longanecker performed "practice runs" where she would knock on the classroom door, pretending to be administration, and the students would open their Language! books. Although portions of the Language! assessments are designed to be read aloud by the teacher, with the exception of certain "example" questions, the Language! assessments are not designed to be answered cooperatively or with the assistance of the teacher.

¶ 53    Longanecker denied all of the charged misconduct (i.e., she denied providing her students with any improper assistance on any assessments). However, the Board found that Longanecker's testimony lacked credibility. In support of this finding, the Board noted several instances of dishonesty on Longanecker's part. For example, although Longanecker admitted that a booklet was found on her desk during the March 4, 2014, search of her classroom, she claimed that it was an ISAT test administration manual rather than an ISAT test booklet. That claim is implausible because the test administration manual and the test booklets have differing color schemes, the test administration manual has no seals, and Evans and other witnesses testified that a test booklet with broken seals was found in Longanecker's classroom.

---

[7]The dissent contends that Mitchell's testimony does not support the Board's finding on this issue because Mitchell admitted that she "did not know what was going on" during the first day of MAP testing. *Infra* ¶ 72. From this, the dissent concludes that Mitchell "did not know what actions were proper or improper" when she saw Longanecker interact with her students that day. *Infra* ¶ 72. However, Longanecker's understanding of what she witnessed it not dispositive. As noted above, Longanecker's conduct, as described by Mitchell, clearly violated MAP testing rules as confirmed by the MAP proctor handbook, which expressly prohibits a proctor from defining words for students or giving them hints or clarifications.

Moreover, Longanecker initially testified that she walked her students to P.E. class at 10:30 a.m. on February 27, 2014, but later admitted on cross-examination that she sent four e-mails between 10:21 a.m. and 10:34 a.m. on that date. The Board found that these and other untruthful statements by Longanecker (see, *e.g.*, the statements recounted *supra* ¶ 28) undermined Longanecker's credibility. Given Longanecker's untruthful statements and given the partial corroboration of some of Mitchell's claims by other evidence, we cannot say that the Commission's credibility findings or its decision to credit Mitchell's testimony over Longanecker's were against the manifest weight of the evidence.

¶ 54 In attacking the Board's credibility and misconduct findings, the dissent repeatedly relies upon our appellate court's recent decision in *Burgess v. Illinois State Board of Education*, 2020 IL App (3d) 170076. *Infra* ¶¶ 67, 70, 73, 85, 88. However, *Burgess* is distinguishable. In *Burgess*, we found certain of the Board's factual findings and credibility determinations to be against the manifest weight of the evidence where, *inter alia*, (1) the Board credited one witness (a man named Doerrer) over another without any fact-finding or explanation (*Burgess*, 2020 IL App (3d) 170076, ¶ 75) despite the fact that Doerrer's credibility was undermined by other evidence (*id.* ¶¶ 75-76), (2) the Board chose to believe three of the Board's witnesses who testified that the plaintiff had made a threatening statement to another teacher during a union meeting (a finding that contradicted the hearing officer's finding) despite the fact that several other witnesses who were within 2 to 10 feet of the plaintiff at the time did not hear the plaintiff make the alleged statement and there was concrete evidence in the record suggesting that the three Board witnesses at issue were biased against the plaintiff but no evidence that the other witness harbored any bias for or against the plaintiff (*id.*), and (3) the Board chose to believe Doerrer's testimony that the plaintiff made another offensive comment to him immediately following another union meeting despite Doerrer's credibility problems and despite the fact that another Board witnesses who was standing right in front of Doerrer at the time testified that he did not hear any such comment (*id.* ¶ 80). Under these particular circumstances, we held that the Board's credibility determinations and its findings that the plaintiff had made the two alleged statements at issue were against the manifest weight of the evidence. Here, by contrast, there is no evidence suggesting that Mitchell was biased against Longanecker, and Mitchell's testimony on certain critical matters was corroborated by other evidence. *Supra* ¶¶ 44, 47, 50. Moreover, as noted above, Longanecker's credibility was undermined by certain false statements she made, and her denials of Mitchell's account of the relevant incidents were not corroborated by other witnesses or other record evidence. [8] Accordingly, *Burgess* differs from this case in several material respects, and its holding does not support Longanecker's argument.

¶ 55 The Board's finding that Longanecker's misconduct was not remediable was also amply supported by the evidence. If the Board finds that the charges of misconduct against a teacher have been proven, it must determine whether the teacher's conduct is remediable. *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622*, 67 Ill. 2d 143, 153 (1977). Conduct is irremediable if it (1) causes damage to the students, faculty, or school and

---

[8]Contrary to the dissent's suggestion, Student B's testimony that he did not recall asking any questions or receiving any help during MAP testing does not contradict Mitchell's testimony that Longanecker gave such help to some of her students nor does it support Longanecker's denials of such misconduct.

(2) could not have been corrected if the teacher's superiors had warned her. *Id.* Misconduct causes damage to the students, faculty, or school where, *inter alia*, it is harmful to the individual student-teacher relationship or to the reputation of the faculty and the school. *McBroom v. Board of Education of District No. 205*, 144 Ill. App. 3d 463, 473 (1986).

¶ 56     Because the hearing officer found that the charges against Longanecker had not been proven, he made no finding as to whether Longanecker's alleged misconduct was remediable. However, the Board issued several supplemental factual findings supporting its conclusion that Longanecker's conduct was not remediable. Specifically, the Board found that Longanecker's misconduct damaged Glenview's students, faculty, and staff because (1) helping students answer MAP and Language! assessments defeated the purpose of those assessments and jeopardized the students' education; (2) by implicating Student A in some of her misconduct, Longanecker damaged the student-teacher relationships she had with Student A and with her other students, as Student A testified that other students told him that he had caused Longanecker to lose her job; (3) Longanecker's misconduct set a terrible example for Mitchell and for Glenview's staff and students; (4) Longanecker's misconduct caused the District to report Longanecker's opening of Student A's test booklet as a testing irregularity to the ISBE, which could potentially have resulted in the suppression of the students' scores and could have jeopardized the school's federal funding under the No Child Left Behind Act; and (5) Longanecker's misconduct was unconscionable, embarrassing, and damaged the reputation of Glenview and the District as a whole. The Board also found that no warning could have prevented or corrected Longanecker's misconduct because the ISAT test booklet contains numerous warnings against opening test booklets prematurely, as does the ISAT test administration manual that Longanecker acknowledged receiving. Moreover, Longanecker testified that she knew that opening a test booklet before the administration of a test is prohibited.[9]  Although she denies that the charges against her were proven, Longanecker does not challenge the Board's determination that the alleged misconduct, if it occurred, would be irremediable. Nor do we find the Board's finding on this issue to be against the manifest weight of the evidence.

¶ 57     Having found that the Board's factual findings were not against the manifest weight of the evidence, we must determine whether Board's findings provide a sufficient basis for its conclusion that cause for discharging Longanecker existed. As noted above, a school board's determination of cause to discharge is subject to reversal where it is "arbitrary, unreasonable, or unrelated to the requirements of service." *Beggs*, 2016 IL 120236, ¶ 63. This is a mixed question of law and fact that we review under the clearly erroneous standard of review. *Id.* We will uphold the Board's discharge decision unless, after applying the governing legal standard for discharge to the established facts, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.*

¶ 58     We find no such mistake here. The facts, as found by the Board, clearly provided cause for the Board's decision to discharge Longanecker. The Board found that Longanecker improperly opened a sealed ISAT test booklet with the expressed intention to cheat on the test and improperly assisted her students in the MAP and Language! assessments despite her

---

[9]In addition, the MAP proctor handbook explicitly prohibits a proctor from defining words for students or giving them hints or clarifications, and Longanecker testified that she would "do harm" to the students if she helped them with "any type of assessment."

knowledge that such conduct was prohibited and was harmful to students. As shown above, these serious acts of misconduct damaged the students, faculty, and school in several respects. Moreover, they represent a violation of Longanecker's core duties as a teacher. Accordingly, Longanecker's termination was justified and cannot be considered arbitrary, unreasonable, or unrelated to the requirements of Longanecker's service.[10]

¶ 59 In sum, we hold that the Board's factual findings were not against the manifest weight of the evidence and that the facts, as found by the Board, provided a sufficient basis for the Board's conclusion that there was cause to discharge Longanecker. We have considered the other arguments raised by Longanecker and find them to be without merit. We therefore affirm.

¶ 60 CONCLUSION

¶ 61 For the reasons set forth above, the judgment of the circuit court of Rock Island County, which upheld the Board's decision, is affirmed.

¶ 62 Affirmed.

¶ 63 JUSTICE O'BRIEN, dissenting:

¶ 64 I agree with the majority that we review the decision of the Board. But unlike the majority, I believe that analysis begins with a review of the Board's determination that the findings of the hearing officer were against the manifest weight of the evidence. The statutory scheme allows for the Board to modify or supplement the hearing officer's finding of fact but only if, in its opinion, the hearing officer's finding of fact is against the manifest weight of the evidence. 105 ILCS 5/24-12(d)(8) (West 2014). In order to review the Board's decision, it is necessary to review the entire record as instructed by the supreme court in *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 61.

¶ 65 Unlike the majority, I find the hearing officer's findings are not against the manifest weight of the evidence and were not subject to modification and supplementation by the Board. Further, I find the Board's findings are against the manifest weight of the evidence. In order for the Board to modify and supplement the hearing officer's findings, it was required to determine that those findings were against the manifest weight of the evidence. In doing so, we look to see if the modified and supplemented findings were against the manifest weight of

---

[10]This case is readily distinguishable from *Beggs*, where the only misconduct supported by the evidence was a single incident when the plaintiff teacher delayed teaching for 15 minutes at the start of class on a single occasion. 2016 IL 120236, ¶¶ 68-69. The plaintiff had returned to class that day after an extended leave of absence that she had taken in order to care for her mother, who was dying. On the day of her return to the classroom, the plaintiff delayed instruction for no more than 15 minutes while she was "getting her bearings" and "attempting to determine what had been covered by the substitute [teacher] during [the] plaintiff's near-monthlong absence." *Id.* ¶ 69. Our supreme court found that this single incident was an "understandable and minor breach," and not a clear and material breach, of the remedial warning notice that the school board had previously given the plaintiff. *Id.* ¶¶ 71-72. Under these circumstances, our supreme court held that the Board's decision to discharge the plaintiff was clearly erroneous. Here, by contrast, the multiple proven acts of misconduct by Longanecker were far more serious, more connected to Longanecker's core teaching duties, and more harmful to the students, the faculty, and the school.

the evidence. Below are what I consider inaccuracies in the Board's findings and interpretations of the hearing officer's findings and the majority's determinations regarding them.

¶ 66    The majority finds that the Board's determination that Longanecker engaged in the charged misconduct was not against the manifest weight of the evidence, relying in large part on the testimony of the student teacher, Mitchell, as support for the finding. The majority does not explain how the hearing officer's rejection of Mitchell's testimony was against the manifest weight of the evidence as required before the Board can modify and supplement the hearing officer's findings. The majority discredits the hearing officer and Longanecker's challenge to Mitchell's credibility based on her "hazy" recollection of events. The Board presented its supplemental finding that Mitchell was credible and her lack of memory did not affect her credibility. The majority, like the Board, speculates that Mitchell's lack of detail regarding all the events of the day of the alleged cheating except Longanecker's actions regarding the test booklet was to be expected based on the stress of the situation. Mitchell could not recall whether there was an assembly that day (there was) or whether she had crafted lesson plans for a poetry pretest (the unit had not yet started). Significantly, Mitchell was unable to recall whether the students worked up until the bell for physical education class rang. If Mitchell's version of events is to be believed, Longanecker opened the test booklet as soon as the students left the classroom unattended to proceed to physical education class, which would be part of the time frame the Board credits Mitchell's credibility, that is, when Longanecker supposedly opened the test booklet and blatantly told Mitchell about her plans to cheat.

¶ 67    Unlike the majority and the Board, I believe the facts demonstrate that if any version of events lacked credibility it was the version testified to by Mitchell, who was able to remember only details harmful to Longanecker and nothing else from the same less-than-five-minute period. Despite that her claims contradicted other established facts, the Board inexplicably credited Mitchell, a student teacher with limited classroom and testing procedure experience, above Longanecker, a long-term tenured teacher who had earned commendations for her teaching skills and apparently had hosted other student teachers without incident as evidenced by her waiver inquiry to the student teacher coordinator. See *Burgess v. Illinois State Board of Education*, 2020 IL App (3d) 170076, ¶ 75 (rejecting Board's "hierarchy" of witness credibility and "sleight-of-hand acceptance" of testimony where its findings were not supported by the facts). Because the Board's, and by implication, the majority's conclusions are contrary to the evidence, they are based on pure speculation. While Mitchell did testify it was a very stressful period, there was no testimony that stress induces memory loss or allows a person to remember only certain events occurring in the same time period. In addition, despite the apparent stress of Longanecker's alleged misconduct, Mitchell met with her student teaching supervisor the following day and did not mention the incident with Longanecker. Mitchell's stress did not relieve her of the responsibility to present accurate testimony. This supplemental finding is against the manifest weight of the evidence.

¶ 68    The majority considers Mitchell's testimony was supported by that of Student A, to whom the test with the broken seals was assigned. It looks to the Board's conclusion that Student A told Harris, the principal, that he did not break the seals on the reading portion of the test, as testified by Harris. The Board outright rejected the testimony of Student A at the hearing, where he provided several different versions of what happened and then stopped answering questions. The Board rejected the hearing officer's determination regarding Student A and

substituted its conclusion that Harris's testimony as to what Student A told him was more reliable than the student's version. The Board at once rejects and accepts Student A's claims, finding the one that accords with Harris's version of events to be more credible while finding Student A himself to not be credible. This finding is against the manifest weight of the evidence. Also unsupported by the evidence is the majority's reliance on the testimony of Student A that his test booklet had broken seals as support that Longanecker opened the tests to determine what material to teach her class. Again, based on the finding that Student A was not credible, the majority errs in using his testimony to support the otherwise unsubstantiated claims of the student teacher.

¶ 69    The majority further considers that there was sufficient evidence, based in large part on Mitchell's claims, to support the Board's findings that Longanecker engaged in misconduct regarding the MAP testing and Language! program. The majority notes the test procedures specifically prohibit a proctor from engaging in the activities Mitchell claimed occurred. As discussed below, the administration of the MAP test and the ISAT were not in accord with any testing protocols and the MAP score increases by Longanecker's students were considered suspect only when viewed in light of Mitchell's allegations. Mitchell's claims regarding the alleged Language! misconduct were contradicted by the testimony of the superintendent and principal, each of whom witnessed the program being employed in Longanecker's classroom. The majority considers that Mitchell's testimony, as well as the increase in MAP scores, establishes that the Board's findings were not against the manifest weight of the evidence. I disagree.

¶ 70    The hearing officer found Mitchell's claims that Longanecker violated the MAP testing procedures unsupported by the evidence. In turn, the Board rejected as against the manifest weight of the evidence the hearing officer's findings that the Board did not prove Longanecker's misconduct regarding the MAP testing and Language! program. The Board rejected the hearing officer's conclusions and supplemented the findings, determining that the evidence proved Longanecker engaged in misconduct. In dismissing the hearing officer's findings, the Board placed substantial weight on the testimony of Mitchell. She claimed Longanecker inappropriately answered students' questions during the examination and directed her to do the same. Contrary to Mitchell's claims, Student B, who had significant gains on his MAP scores, said Longanecker did not ask questions or help him during the test. No witnesses corroborated Mitchell's allegations to the contrary. The Board did not find and no evidence supports its elevation of Mitchell's version of events over the student. Instead, the Board surmised that Longanecker aided other students, which raised their scores. The Board's conclusion was not based on the evidence and did not explain how it was reasonable. See *Burgess*, 2020 IL App (3d) 170076, ¶ 75 (finding Board's recognition of credibility of one witness over another without fact finding or explanation "extremely suspect"). The Board places stock in the specificity of associate superintendent Peterson's testimony explaining the MAP scores, determining that the evidence did not support the hearing officer's finding that the MAP scores did not alert the administration to any testing improprieties. The hearing officer found that the principal stated that individual scores did not indicate any cheating took place; the Board determined that Harris said he only looked at the class scores as a whole. In contrast, Peterson testified that a benefit of the MAP testing was that it allowed the students' individual progress to be tracked.

¶ 71     Regardless of whether individual or the classroom scores were considered, the evidence demonstrated the MAP scores fluctuated and that another teacher had similar gains as Longanecker. Although the Board found the hearing officer misstated the evidence by looking at individual scores, the evidence nevertheless demonstrated that at least one other teacher had similar gains as Longanecker. Indeed, Peterson stated in an e-mail that the other teacher's "class [was] comparable." Harris himself testified that the jump in MAP scores did not mean the students received inappropriate help. That Peterson added more information regarding the test results does not negate that evidence. Moreover, Peterson expressly opined that the increase in MAP scores only raised a red flag in light of Mitchell's allegations. In contrast, the hearing officer noted that there was no data to support Mitchell's accusations. In fact, although the Board takes offense at the hearing officer's conclusion, contending that the testimony was directed only at the Language! scores, the data showed Longanecker's MAP scores were comparable to the other teacher's class, leaving Mitchell's claims that Longanecker cheated on the MAP tests unsubstantiated. Peterson acknowledged during her testimony that she had not yet evaluated the MAP and Language! scores before she determined that Longanecker should be dismissed.

¶ 72     The Board again employs circular reasoning regarding Mitchell's credibility. It uses her statements to support evidence, which it then claims supports her version of events. However, even Mitchell's own testimony does nothing to support her allegations of impropriety during MAP testing. She specifically testified that she did not know what was going on the first day of testing. From that, the only conclusion that can be drawn is that Mitchell did not know what actions were proper or improper on the first day of MAP testing. She testified that children would call out questions and Longanecker would either answer or direct the students to the correct answer. But the nature of the testing, as set forth in the MAP proctor handbook, negates a conclusion that the entire class would benefit from such conduct on the part of Longanecker. The MAP testing is individualized with each child receiving a different test, so the conduct described by Mitchell would not have benefitted the entire class but only the child asking the specific question. Therefore, even accepting all of Mitchell's testimony as accurate, it does not confirm that the increase in the MAP test scores of a majority of the students was a result of any improper assistance or coaching of the class by Longanecker.

¶ 73     As with the MAP testing, Mitchell's testimony about the Language! program does not negate the hearing officer's finding that the Board did not prove misconduct. Mitchell claimed that Longanecker seldom used the program but prompted her students to pretend they were using it by pulling their books out of their desks if the principal came to the door. In contrast, principal Harris, superintendent Humphries, and assistant superintendent Peterson all testified that they observed on several occasions the Language! program in action in Longanecker's class, describing the lessons as energetic and the students as engaged. As described by Peterson, the program was designed with a class component, where the teacher was required to read portions of the assignments aloud, which makes Mitchell's claims that Longanecker's conduct consisted of cheating incredible. See *Burgess*, 2020 IL 170076, ¶ 80 (finding of misconduct not supported by evidence where testimony was not corroborated and "in light of the fact" the witness was not as credible as the Board deemed him). I do not consider that the hearing officer's conclusions that the Board did not prove Longanecker engaged in misconduct in administering the MAP and Language! tests to be against the manifest weight of the evidence.

¶ 74     The Board rejects the hearing officer's conclusion that the test security checklist did not show that Dunn delivered the test booklet No. 4587910063 to Longanecker's classroom. The Board acknowledged the hearing officer's findings that Dunn failed to sign the security checklist were correct but concluded instead that Dunn's testimony that she delivered the test booklets was sufficient to establish that test booklet No. 4587910063 was among the test booklets she delivered. This conclusion is improbable and not based on the evidence. The Board must not substitute its findings for that of the hearing officer unless the hearing officer's findings were against the manifest weight of the evidence. Here, the Board itself acknowledged the hearing officer's findings were correct but proceeded to replace them with its own findings. See *Beggs*, 2016 IL 120236, ¶¶ 66-67 (determining Board's rejection of hearing officer's findings was not supported by the evidence and reversing Board's termination of teacher). The Board focuses on the hearing officer's statement that test booklet No. 4587910063 was not "on the original Security Checklist that Dunn delivered" to Longanecker's classroom, asserting that there was no evidence to support the checklist itself was delivered. The location of the security checklist was not at issue, and it is unlikely the hearing officer would direct a finding toward it. The reasonable interpretation of the hearing officer's finding is that the test booklet at issue was not delivered to Longanecker's classroom. This interpretation is supported by the testimony of Kalman, who testified that Harris wrote No. 4587910063 on the security checklist during the meeting in Longanecker's classroom during the investigation into her alleged misconduct. There was absolutely no evidence presented to support the Board's conclusion that booklet No. 4587910063 was part of the group delivered to Longanecker's classroom. Indeed, it is undisputed that the specific test booklet number was not included on the booklets assigned to Longanecker.

¶ 75     The Board finds the video supports that test booklet No. 4587910063 was delivered to Longanecker's classroom. The video does not support or corroborate that the booklet was delivered. Thus, the Board's finding that the hearing officer's finding was against the manifest weight of the evidence was inconsistent with the evidence. It is undisputed that the video shows Dunn delivered test booklets to Longanecker's classroom around 9:14 a.m. on February 27, 2014. Contrary to the Board's findings, she testified that she had a test security checklist that listed the numbers of the tests assigned to Longanecker's students and provided it to the associate principal Evans when he asked for it. She did not leave it in Longanecker's classroom or deliver it with the test booklets. She did not testify that the list included the handwritten numbers as the Board found and she did not testify that the test booklet numbers that were handwritten on the security checklist were delivered or assigned to Longanecker. Dunn said she could not answer off the top of her head, although she assumed the tests found in Longanecker's room were assigned to her and would have been so indicated on the master list she kept in her office. However, she could not say to whom the test booklet in question was assigned. The security checklist which indicated which tests were assigned to Longanecker did not include test booklet No. 4587910063 with the broken seals. The Board concludes Dunn "clearly testified" the handwritten books were assigned to Longanecker. Dunn's answer, "I don't know," does not show she "clearly testified" and does not establish that the hearing officer's findings were against the manifest weight of the evidence.

¶ 76     I consider that Dunn's testimony, in addition to the other evidence presented, established that the school district failed to follow any of the required testing procedures. The fact of the matter is the evidence is replete with every indication that tests, including the ISAT, were not

administered correctly in every aspect. The school personnel were not provided training or copies of the testing manual as required. Dunn left the tests in unlocked classrooms although the tests were supposed to be kept locked up at all times. She herself was unaware that she held the position of test coordinator and believed the school principal was the test coordinator. The security checklist included a block of tests purportedly assigned to Longanecker which were not found in her classroom as noted by a question mark and reference to another teacher written on the checklist by Harris, the principal. Kalman, the union co-president and fellow teacher, testified there were problems with the tests in the fifth grade, with "subs and tests being shuffled." The Board relies on Kalman's statement that Student A was always in Longanecker's class, which it then inexplicably determines reflects that the test booklet at issue was not "shuffled." The evidence does not support the Board's conclusion that test booklet No. 4587910063 was delivered to Longanecker's room, indicated on the master list and assigned to Student A.

¶ 77    The evidence further reflects that the school's testing procedures were haphazard and not in compliance with test policies. Another teacher at the school gave the wrong section of the test. Two other teachers encountered issues with the test booklet seals and another teacher had the wrong names and booklets. That the testing security was deficient was acknowledged by a series of e-mails between administrators where the school principal admitted the district could be vulnerable on its test security measures. The Board's determination that the video and Dunn's testimony supports its conclusion that the hearing officer's finding that test booklet No. 4587910063 was not assigned to Longanecker is incorrect and not based on the evidence. The Board further concludes that despite evidence of testing improprieties across the board, the hearing officer's finding of no misconduct was contrary to the evidence and modified the finding based on its perspective that the opposite conclusion was clearly evident. Importantly, the numerous and systemic testing improprieties cast all the district's claims regarding test security in doubt. The only viable conclusion is that the school's testing procedures were unreliable and not based on the applicable regulations.

¶ 78    The Board similarly rejects outright the hearing officer's conclusion that the evidence revealed an animus directed toward Longanecker by the administration. The record established several teachers who had indicated issues with Harris throughout his one-year tenure as principal, although at least some of his behavior about which the teachers complained included incidents prior to his principalship. One teacher suggested Harris continued to retaliate against her once he became principal. Other examples supporting animus include a number of e-mails between the administrators about the alleged broken seals in which they disparaged Longanecker and complained about her strong personality and the effect her having cancer had on interactions with other teachers and discussed their concerted goal to dismiss her. The Board looks to a letter of commendation Longanecker received from Humphries in October 2013 and an e-mail she wrote in January 2014 in response to a reprimand she received for an unconnected incident in which she praised Harris and indicated her respect for him as evidence there was no animus. However, the Board also considered the e-mail indicative of Longanecker's lack of credibility, noting that she in fact did not respect Harris despite her claims in the e-mail. The Board also took offense to Longanecker's assertions that the majority of her students had attention deficit disorder (ADD) or attention deficit hyperactivity disorder (ADHD) despite the fact that the majority of her students did not have individualized assessment programs (IEP) demonstrating ADD or ADHD and her claims that she finished books A and B in the Language!

program. In contrast with the administration's descriptions of Longanecker as a drama queen, I fail to see how two examples of exaggeration coincide with a lack of any credibility on matters of importance. Moreover, Longanecker acknowledged she erred in her claims of finishing two books in Language!, agreeing that it would be physically impossible. Oddly, the Board relies on the fact that she did not correct herself until another teacher questioned her progress, which would seem a reasonable response when one unknowingly makes a mistake.

¶ 79    The Board's other supplemental facts were not supported by the evidence. First, the Board noted that neither the fifth grade teacher down the hall from Longanecker's classroom nor the physical education teacher who met the students at the drop-off corner supported Longanecker's claims that she walked her class to physical education at the time Mitchell claimed Longanecker was unsealing a test booklet. The teachers could not remember specifically if Longanecker escorted her students on February 27, 2014, but both witnesses testified that it was the regular practice of the fifth-grade teachers, including Longanecker, to walk their students to the drop-off point. The majority relies on this testimony as evidence supporting the Board's finding that Longanecker lacked credibility. This testimony neither confirms nor discredits Longanecker's story about walking her students to physical education and does not support the Board's finding that Longanecker did not walk her students to the meeting point that day, which directly contradicts Mitchell's claims. The Board is limited to supplementing the findings only when the hearing officer's findings are against the manifest weight of the evidence. The hearing officer did not include the testimony of the two teachers in his findings, presumably because they did not add to or detract from the facts at issue.

¶ 80    The Board challenges the hearing officer's observation to Longanecker's inquiry during Humphries's testimony that the video from the hallway could have shown Longanecker walking her students to the physical education class meeting place. Humphries stated that nothing was offered by Longanecker in support of her claim that she escorted her students. The Board supplemented the hearing officer's findings, characterizing Humphries's testimony on this point as an important fact. It considered that the bill of particulars was served on Longanecker on March 18, 2014, and alleged that she opened the test booklet when the students left for physical education. The Board further surmises that because the technology director testified videos were preserved for 30 days, Longanecker had ample time to secure the video in support of her version of events and her failure to do so leaves Humphries's testimony uncontradicted. Humphries himself testified that Longanecker's failure to provide evidence in her behalf indicated to him that "she herself felt that she was guilty." Although he ran the investigation, he could not "recollect" whether he asked for the video to confirm Longanecker's or Mitchell's version of events. He did not know who asked for the video footage but suggested that "someone must have" requested the video. He was aware that "some people" viewed it. He did not watch it because he considered that there was no conflicting evidence to which the video would speak.

¶ 81    Humphries described his obligation in the investigation as to look at all sides but determined that Longanecker did not offer any evidence, and since there were no cameras in her classroom, he was not sure what the video would have shown. He did, however, acknowledge the hallway video would have shown if Longanecker escorted her students. In his view, his expectation as the investigator as to whether others such as Longanecker should bring him information depended on the circumstances. For example, he sought out an interview with Mitchell but did not seek out the video because there were no assertions that Longanecker

offered the video "in hopes of exoneration." According to Humphries, "there's been nothing offered." He could not explain why the video was not viewed, but he was never asked to look at it or offered a reason why he should look at it. He did recall viewing a still photo from video footage supporting that Dunn dropped the tests off in Longanecker's classroom but did not know who asked for that video. In his view, he would have expected Longanecker to provide evidence in her defense, although it was not her responsibility to exonerate herself. He found her absence of explanation telling and considered that Longanecker never admitted nor denied the charges against her. In his experience, guilty people deflect, for example, with anger or agitation, like Longanecker did, although he also admitted a person falsely accused would be angry and agitated.

¶ 82    The Board also added as critical testimony that the bell schedule shows physical education class was 41 minutes long with 3 minutes for the passing period. In its reasoning, the length of the physical education period apparently contradicted Longanecker's claims regarding the time sequence surrounding her class going to the physical education meeting place on February 27 and supported its finding that Longanecker lacked credibility, which the majority accepts. The Board considered its interpretation of the time periods made Longanecker's testimony of her actions during that period not possible or likely and thus unsupported by the evidence. However, contrary to the Board's finding, Longanecker's testimony was not that "nothing happens" when the bell rings but that the students are required to wait for her or the student teacher to release them to line up to leave the classroom for physical education class. Further, she said she did not leave the room at precisely 10:30 a.m. with the students, that the bell rang at 10:32 a.m., that a lesson could continue past the bell, and that the student preparation time to line up to leave took approximately one to four minutes. Longanecker stated that she would delegate some duties to the student teacher, such as preparing the students for physical education class, and that the students would never leave the room without her. I see no connection between the events as described by Longanecker and the testimony of the other fifth grade and the physical education teachers, and I am not persuaded that the hearing officer's failure to include the other teachers' statements was against the manifest weight of the evidence. In addition, I find no connection between the teachers' testimony and Longanecker's credibility. As stated above, the supplemented findings do not confirm or deny Longanecker's version of events that morning and the Board had no reason to add them to the order and to reject the hearing officer's findings on this issue. Indeed, the fact that there is evidence Longanecker sent e-mails during this time period, which she could have done after walking her students to the physical education class meeting place as she testified, discredits Mitchell's recollection of events and makes the Board's conclusions speculative and in contradiction to the evidence.

¶ 83    Next, the Board accords weight to the fact that Longanecker received an e-mail from the student teacher's supervisor the Monday after the alleged cheating stating that Mitchell would be absent the rest of the week "due to a personal issue" and finds it supports the student teacher's claims that Longanecker indicated she was going to "teach to the test." According to the Board's reasoning, the e-mail on March 4 regarding the student teacher alerted Longanecker that the student teacher reported Longanecker's misconduct and allowed Longanecker time to destroy any lesson plans prepared based on the ISAT materials. The e-mail does not contain any language from which Longanecker could determine that Mitchell had made an allegation against her. To the contrary, the e-mail to Longanecker included

information apparently in response to a request from Longanecker regarding waivers she received from Western Illinois University that were missing or expired in addition to the information regarding Mitchell. In response, Longanecker indicated that she hoped all was well with Mitchell. There is nothing, not one single word, in the e-mails to provide any support for the Board's finding that the e-mails alerted Longanecker that Mitchell had reported her misconduct and caused her to destroy improper lesson plans. The Board's findings in this regard are blatant speculation. There is simply nothing in the record that shows the e-mail from Mitchell's teaching advisor to Longanecker somehow "alerted" her to destroy her lesson plans. Testimony by the district's technology director established that he searched Longanecker's computer and did not find any evidence that she tailored her lesson plans or classroom activities to the ISAT. The search by the technology director would uncover any destroyed documents and did not. Although the Board surmises that Longanecker knew to use only handwritten lesson plans, there is no support anywhere in the record for the Board's finding, which, again, is pure speculation and is insufficient to overturn the hearing officer's findings.

¶ 84   The hearing officer found there was no evidence to support Mitchell's testimony that Longanecker intended to tailor her lessons to the ISAT. The Board, however, rejected the hearing officer's findings, despite a search of Longanecker's computer by the technology director and a review of the items on the walls of Longanecker's classroom, which uncovered no evidence to support Mitchell's claims. In contrast, the Board determined that the hearing officer overstated the importance of the lack of supporting evidence. In its view, the evidence established that Longanecker was aware that Mitchell had reported her misconduct before Harris or the other administrators knew, allowing her the opportunity to destroy the teaching materials. The Board bases its theory on the facts that Mitchell claimed Longanecker opened the test booklet on February 27 and that Longanecker received an e-mail on March 4 from Mitchell's supervisor informing her that Mitchell would be absent from student teaching. According to the Board, the e-mail alerted Longanecker that Mitchell had reported her alleged misconduct. However, the e-mail merely stated that Mitchell's absence was due to "a personal issue." It is improbable to interpret the e-mail as an indication that Mitchell had reported Longanecker for cheating and a forewarning for her to destroy the alleged instructional materials she alleged created in response to her review of the test.

¶ 85   Similarly speculative are the Board's supplemental findings that the test booklet and the instruction manual are impossible to confuse. I do not know how this arbitrary statement can be taken as a finding of fact. Longanecker testified that she brought the instruction manual to Harris as he was going through the tests. Evans said Longanecker found a test booklet and he saw broken seals on it when she brought it to Harris. The Board finds significant that Longanecker admitted that a "booklet" was found in her classroom separated from the other test booklets. Longanecker actually testified that she found the test manual on her desk and brought it to Harris while he was examining the test booklets for open seals. According to the Board, it would be impossible to confuse the two booklets, despite that they both had orange and white covers. The Board points to Evans's testimony that he could see the broken seals as support that it was "clearly evident" the booklet Longanecker discovered was the booklet at issue. The testimonies concerning the discovery of test booklet No. 4587910063 were anything but "clearly evident." Harris testified that Evans found the booklet with open seals on Longanecker's desk among other papers and brought it to him. He said the booklet was placed on the top of the pile. Evans claimed the open-sealed test booklet was found in the front of the

classroom under a pile of papers near Longanecker's desk and that Longanecker found it and brought it to him and Harris, who added it to the top of the pile to be reviewed. Kalman testified she did not see where booklet No. 4587910063 was found. The Board's findings that "it is clearly evident that [Longanecker] brought from [her] desk an ISAT test booklet with open seals" is against the manifest weight of the evidence. See *Burgess*, 2020 IL App (3d) 170076, ¶ 79 (rejecting Board's conclusion where there was "no consensus" misconduct occurred). Opposing testimony was presented, negating the possibility that anything was "clearly evident," and aside from the Board's own judgment, there was no evidence that "it would be impossible to confuse" the manual and test booklet. Moreover, the majority reliance on this finding as evidence that Longanecker lacked credibility is without merit.

¶ 86    The Board supplemented the hearing officer's findings with its interpretation of Longanecker's response to the investigation into the test booklets. The Board affords substantial weight to Longanecker's comments before the group entered her classroom to examine the test booklets where she told a colleague she thought she was being accused of stealing test booklets. She commented that she did not care enough about the test to cheat. The Board concludes this supports that Longanecker engaged in misconduct and cheated on administering the tests. In my view, this comment is reasonable in light that the principal had just informed Longanecker that she had to account for all the test booklets. I find her comments that she did not care enough about the test to cheat or steal the booklets do not aid the Board's conclusion that they supported Mitchell's version of events. They are not an admission of cheating. Furthermore, as discussed above, Mitchell's testimony was not supported by any evidence that Longanecker adapted her lessons to the test as Mitchell stated.

¶ 87    It is also contrary to the Board's supplemental finding that Mitchell's version is further supported by e-mails Longanecker sent during the time the Board presumes she was walking her students to the physical education meeting point. It was probable that Longanecker delegated, as was her practice, the physical education preparation to Mitchell while she caught up with her e-mails on the computer located in her classroom. Longanecker suggested that she could have stopped in the office after escorting her students and sent the e-mails from there. The administration did not present any evidence about the e-mails Longanecker said she sent, such as from which computer they originated. The time of the e-mails does not contradict Longanecker's timetable of events and does not support Mitchell's version. Actually, the time of these e-mails stands in direct conflict with Mitchell's testimony that Longanecker opened the test booklet as soon as the students were dismissed for physical education class. The timing of the e-mails refutes Mitchell's testimony in that regard. The Board's opposite determination is against the manifest weight of the evidence.

¶ 88    The Board's findings of fact and the manner in which it made credibility determinations are very similar to the scenario set forth in *Burgess*, 2020 IL App (3d) 170076, ¶¶ 75, 77, where this court rejected the Board's ultimate findings of fact as against the manifest weight of the evidence where there was no basis for finding the Board's witnesses more credible other than bias. The same is true here. A complete review of the record in this matter demonstrates the Board's supplemental findings were against the manifest weight of the evidence and further its ultimate decision to terminate Longanecker was clearly erroneous. I would reverse the Board's decision, adopt the hearing officer's findings, and order Longanecker reinstated as set forth in the hearing officer's opinion.